IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**DERRICK ARTHUR BURDETTE**                                                 **PLAINTIFF**

**v.**                **No. 4:23CV154-DAS**

**MISSISSIPPI DEPARTMENT
OF CORRECTIONS, ET AL.**                                            **DEFENDANTS**

**MEMORANDUM OPINION**

This matter comes before the court on the *pro se* prisoner complaint of Derrick Arthur Burdette, who challenges the conditions of his confinement under 42 U.S.C. § 1983 – which provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit.[1] The plaintiff alleges that defendant Dr. Scott denied him adequate medical care for a sinus condition and an injured knee. Defendant Scott has moved [37] for summary judgment; the plaintiff has not responded, and the deadline to do so has expired. The matter is ripe for resolution. For the reasons set forth below, the defendant's motion [37] for summary judgment will be granted, and the instant case will be dismissed with prejudice for failure to state a claim upon which relief could be granted – and, in the alternative, the case will be dismissed without prejudice for failure to exhaust administrative remedies.

**Summary Judgment Standard**

---

[1] *See* 42 U.S.C. § 1997e(a); *see also Williams v. Henagan,* 595 F.3d 610 (5th Cir. 2010) (PLRA applies when inmate is incarcerated at the time he files suit, even if he was released during pendency of suit).

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998).

Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992). The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999);

*Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

### Undisputed Material Facts[2]

Derrick Arthur Burdette brought this action on August 10, 2023, alleging that he did not receive adequate medical care while housed at the Mississippi State Penitentiary ("MSP") in 2023. He complains that the Dr. Scott did not provide proper care for an injury to his knee sustained while playing basketball on May 24, 2023 – alleging that he should have received an additional diagnostic procedures and that his pain medication was not effective.[3,4] The nurse who examined him that day consulted with a nurse practitioner, who instructed that an X-ray of the knee be done.[5] The nurse noted that Burdette already had pain medication.[6] Burdette admits that the X-rays were taken,

---

[2] The court has drawn the facts and procedural posture from the defendant's brief in support of the instant motion for summary judgment, as they are both well-documented and uncontested.

[3] Complaint [1] section V at p.7. Burdette's complaint does not give the date of the injury, but medical records reflect his presentation to medical on May 24, 2023, complaining that he injured his knee playing basketball. *See* medical records (Exhibit 2 to motion), pp.54-57 (DB-MED 00077–00080). *See also* ARP request, ARP 00065 (Exhibit 1 to motion) (stating injury occurred on May 24, 2023).

[4] The exhibits referenced in this memorandum opinion may be found attached to the defendant's Motion for Summary Judgment.

[5] See Exhibit 2, pp. 53, 57 (DB-MED 00076, DB-MED 00080).

[6] Exhibit 2, p. 57 (DB-MED 00080). Burdette had been seen by a nurse practitioner earlier that month for a complaint of a knot on his knee and associated intermittent pain. X-rays were performed, which showed no abnormality, and Burdette was given naproxen for pain. *See* Exhibit 2,

although he complains that there was a delay of a few days.[7] He was discharged to his housing unit, but he was brought back to medical later that night complaining of pain – and was again seen by a nurse. When he found out that remaining in the medical unit would involve staying in a small holding cell, he chose to return to his housing unit.[8] It appears that Burdette's only consultation with Dr. Scott for the alleged knee injury was on June 21, 2023.[9] At that visit, Burdette reported having sustained an injury resulting in right knee and leg pain, and he complained of swelling of his right calf and muscle pain when walking.[10] Dr. Scott noted that X-rays of the knee had been done, which showed no acute injury, degenerative joint disease, or swelling. She noted that Burdette was requesting an MRI of his right leg. Her examination revealed that Burdette was walking without difficulty and with a normal gait – and that there was no swelling or other abnormality of his knee.[11] Dr. Scott ordered X-rays of the right tibia/fibula.[12] A physical therapy evaluation was also ordered, which Burdette received on July 12, 2023. The evaluation revealed that no intervention was needed.[13]

Burdette was transferred from MSP to Holmes/Humphreys County Correctional Facility ("HHC") on or about October 12, 2023.[14] The medical records do not reflect any further sick calls resulting in referral to Dr. Scott for consultation – or any further complaints of knee or leg pain from

---

pp. 58-59 (DB-MED 00101–00102).

[7] Complaint, section IV.D.

[8] *See* Exhibit 2, pp. 47, 52 (DB-MED 00070, DB-MED 00075).

[9] Exhibit 2, pp.34-37 (DB-MED 00051-00054).

[10] Exhibit 2, p.35 (DB-MED 00052).

[11] *Id*.

[12] Exhibit 2, pp. 36, 38 (DB-MED 00053, DB-MED 00055).

[13] See Exhibit 2, pp. 28-29 (DB-MED 00045–00046).

[14] *See* Exhibit 2, pp. 13-18 (DB-MED 00030–00035) (medical records reflecting intake medical paperwork on being received at HHC).

June 21 through the date Burdette filed the complaint (August 10, 2023) or beyond that to the date of his transfer to HHC.[15]

The records regarding medical care at HHC show that Burdette was seen shortly after intake by Dr. Manuel Ong for a chronic care follow-up.[16] The chart reflects that Burdette did not complain of being in pain.[17] Dr. Ong saw Burdette again on February 5, 2024, for a complaint of leg pain.[18] Dr. Ong noted that Burdette was observed walking into the exam room without difficulty. He further noted that Burdette reported taking Tylenol for pain without relief and that he insisted on having an MRI or ultrasound.[19, 20] Dr. Ong prescribed naproxen for pain and informed Burdette that he did not need an ultrasound or MRI because he had no signs of deep vein thrombosis or serious injury.[21] Dr. Ong concluded that no follow-up or referral was needed.[22]

Burdette also alleges that he did not receive proper treatment for a sinus condition. Medical records reflect that Dr. Scott saw Burdette for this complaint on June 20, 2023,[23] and again on June

---

[15] Chart notes for that period are in Exhibit 2, pp. 21-33 (DB-MED 00038-00050). Medical service request forms for that period are in Exhibit 2, pp. 63, 64, 66, and 68 (DB-MED 00157, DB-MED 00158, DB-MED 00160, and DB-MED 00162).

[16] *See* Exhibit 2, p. 9-12 (DB-MED 00026-00029).

[17] Exhibit 2, p. 10 (DB-MED 00027).

[18] *See* Exhibit 2, pp. 1-3 (DB-MED 00010–00012).

[19] Burdette had been prescribed Tylenol after being seen on November 23, 2023, for an "influenza-like illness" that involved complaints of muscle and body aches. See Exhibit 2, pp. 4, 7 (DB-MED 00021, DB-MED 0024)

[20] Exhibit 2, p. 2 (DB-MED 00011).

[21] *Id*.

[22] Exhibit 2, p.3 (DB-MED 00012).

[23] Exhibit 2, pp. 40-42 (DB-MED 00057–00059).

21.[24] Those visits followed up on a nurse sick-call visit on June 19, resulting in the addition of the antihistamine Chlorpheniramine to his medication prescriptions – which included other antihistamine/antiallergy medications (loratadine and montelukast (Singulair)).[25] In the chart for January 21, Dr. Scott noted that Burdette had not refilled his Singulair or loratadine since December 2022 – although he had refills available.[26] She noted that in March 2023 Burdette had been asked to resume those medications after being found to have certain allergies but that he had told her that he would not do so.[27] She further noted that Burdette had a history of anxiety disorder and "displaying dire concerns and worries about his physical status."[28] She prescribed a course of antibiotics (Augmentin), ordered lab tests, and maintained Burdette's previous prescriptions.[29] Dr. Scott's notes also stated that she would request a CT scan of his head because of the persistence of the sinus symptoms.[30]

Burdette next requested treatment for his sinus issues in August 2023, and he was seen by a nurse on August 8, 2023.[31] He said that his sinuses were infected due to his environment.[32] He was instructed to take loratadine (which was already prescribed) – and to return in seven to ten days if the

---

[24] Exhibit 2, pp. 34-37 (DB-MED 00051–00054).

[25] Exhibit 2, pp. 43, 46 (DB-MED 00061, DB-MED 00064).

[26] Exhibit 2, p. 36 (DB-MED 00053).

[27] Exhibit 2, pp. 34-35 (DB-MED 00051–00052).

[28] Exhibit 2, p. 36 (DB-MED 00053).

[29] *Id*.

[30] *Id*. The notes of Burdette's November 26, 2023, nursing consult at HHC reflect that Burdette told the nurse that "MSP was supposed to send him for CT of sinus but he left before he went." Exhibit 2, p. 6 (DBMED 00023).

[31] See Exhibit 2, pp. 24-27 (DB-MED 00041-00044).

[32] Exhibit 2, p. 24 (DB-MED 00041).

symptoms did not resolve. The nurse did not refer Burdette to see Dr. Scott or another provider.[33]

On August 23, 2023, Burdette was again seen by a nurse for the complaint that he had an infection in his nose since two days before.[34] He had no fever, and no sinus congestion or pain was noted. Burdette said that he thought he had an infection in his blood. The nurse did not refer Burdette to see a provider.[35]

It appears that Burdette made no more complaints about his sinuses before his transfer to HHC in October 2023, and the medical records reflect that that Dr. Scott was not called upon to evaluate or treat Burdette's sinus condition after the consult of June 21, 2023. After Burdette was transferred to HHC, a CT of head was performed on May 1, 2024. That scan showed "No acute intercranial findings."[36]

MDOC records regarding grievances submitted by Burdette to the Administrative Remedy Program ("ARP") at MSP during the relevant time period[37] show that Burdette submitted only one grievance regarding medical care (No. MSP-23-979).[38] In that grievance, dated May 27, 2023, Burdette complained that he had not received proper treatment for a knee injury sustained three days

---

[33] Exhibit 2, p. 26 (DB-MED 00043).

[34] Exhibit 2, p. 21 (DB-MED 00038).

[35] Exhibit 2, p. 23 (DB-MED 00040).

[36] Exhibit 2, p.61 (DB-MED 00121).

[37] The pertinent ARP records, along with the authenticating declaration of ARP official Jacqueline Morgan, are attached to the defendant's motion as Exhibit 1. The relevant time period for pertinent grievances is between May 24, 2023, when Burdette allegedly sustained the knee injury (*see* grievance, Exhibit 1 at page # ARP 00065), and August 10, 2023, the date Burdette filed the complaint.

[38] Exhibit 1, pages ARP 00063–ARP 00077. The only other grievance filed during that period (MSP-23-500) concerned a challenge to disciplinary action. *See* Exhibit 1, pages ARP 00052–ARP 00063).

earlier on May 24, 2023.[39] His principal complaint was that he had not yet had an X-ray of his knee. The grievance did not mention any complaint about lack of medical care for a sinus problem. The first step respondent received the grievance on August 28, 2023.[40] Burdette received the first step response on September 27, 2023 – after he had filed suit.[41, 42] The ARP records show that Burdette did not appeal that response to the second step of the grievance process.[43]

## Exhaustion of Administrative Remedies

All of the plaintiff's claims must be dismissed for failure to exhaust administrative remedies. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), requires prisoners to exhaust any available administrative remedies before filing suit under 42 U.S.C. §1983. Congress meant for the exhaustion requirement to be a tool to help weed out the frivolous claims from the colorable ones. *Jones v. Bock*, 549 U.S. 199, 203 (2007). The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S.81, 89 (2006). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because

---

[39] Exhibit 1, pages ARP 00065–ARP 00067.

[40] Exhibit 1, page ARP 00068.

[41] Exhibit 1, page ARP 00076.

[42] The delay between the submission of the grievance (which was dated May 27, 2023) and the receipt of the first step response was due to the fact that, when Burdette submitted that grievance, he already had a grievance pending: MSP-23-500, which was dated April 23, 2023, and accepted on or about May 3, 2023. Consequently, under the rules of the ARP, grievance MSP-23-979 was put on backlog and not processed until the pending grievance was concluded. The Second Step Response for MSP-23-500 was issued on August 17, 2023 (*see* page ARP 00062 of Exhibit 1). Grievance MSP-23-979 was then sent to the first step respondent, who received it on August 28, 2023 (*see* pages ARP 00064, ARP 00068 of Exhibit 1). *See* Declaration of Jacqueline Moore ¶ 4.

[43] Declaration of Jacqueline Morgan ¶ 5 and Grievance Response, Exhibit 1, page ARP 00077.

"*proper* exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006) (emphasis added); *see also Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008) (the Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement) (*citing Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)); *Lane v. Harris Cty. Med. Dep't*, No. 06-20935, 2008 WL 116333, at *1 (5th Cir. Jan.11, 2008) (under the PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). Indeed, "a prisoner must now exhaust administrative remedies even where the relief sought – monetary damages – cannot be granted by the administrative process." *Booth v. Churner*, 532 U.S. 731, 739 (2001).

The requirement that claims be exhausted prior to the filing of a lawsuit is mandatory. *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. A prisoner should face a significant consequence for deviating from the prison grievance procedural rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .

*Woodford* at 95.

Mississippi Code Annotated § 47-5-801 grants the Mississippi Department of Corrections the authority to adopt an administrative review procedure at each of its correctional facilities. The Mississippi Department of Corrections has thus set up an Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a complaint or grievance relating to any aspect of

his incarceration. This court approved the ARP Program in *Gates v. Collier*, GC 71-6-S-D (N.D. Miss. Feb. 15, 1994). *See also Marshall v. Price*, 239 F.3d 365, 2000 WL 1741549, at *1 (5th Cir. 2000). An inmate must complete two steps to exhaust the ARP process. *See Gates v. Barbour*, No. 4:71CV6-JAD, Doc. 1242 (N.D. Miss. Aug. 19, 2010); *Threadgill v. Moore*, No. 3:10CV378-TSL-MTP, 2011 WL 4388832, at *3 n.6 (S.D. Miss. July 25, 2011).

The inmate may initiate the two-step ARP grievance process by submitting his allegations in writing to the prison's Legal Claims Adjudicator within thirty days of the incident.[44] *Howard v. Epps*, No. 5:12CV61-KS-MTP, 2013 WL 2367880, at *2 (S.D. Miss. May 29, 2013). The Adjudicator initially screens the complaint and determines whether or not to accept it into the ARP process as a grievance. *Id*. The screening phase thus operates as a filter – applied before the formal grievance process begins – to remove procedurally defective or otherwise invalid grievances. As set forth above, a prisoner cannot satisfy the exhaustion requirement by filing a procedurally defective grievance or appeal. *Woodford, supra*.

Hence, rejection of a grievance during the screening phase terminates the grievance – and does *not* count as exhaustion of the grievance process. *See Seales v. Shaw*, No. 5:15-CV-59-KS-MTP, 2016 WL 616749, at *3 (S.D. Miss. Jan. 26, 2016), *report and recommendation adopted sub nom. Seales v. Wilkinson Cty. Corr. Facility*, No. 5:15-CV59-KS-MTP, 2016 WL 616385 (S.D. Miss. Feb. 16, 2016) (finding rejection during initial MDOC screening process not to constitute exhaustion); *Goldmon v. Epps*, No. 4:14-CV-0112-SA-SAA, 2015 WL 5022087, at *3 (N.D. Miss. Aug. 24, 2015) (same); *see*

---

[44] If an inmate is found guilty of a prison rule violation, he may appeal that finding through the ARP process. Inmate Handbook, Section VIII, Paragraph XI. However, the appeal of a rule violation through the ARP is a one-step process (in contrast to the two-step process for resolving grievances). *Id*.

*also* Robinson *v. Wheeler*, 338 Fed. Appx. 437 (5th Cir. 2009) (per curiam) (not reported) (upholding Louisiana initial screening provision of prison grievance process). However, if the defects in the original grievance were minor ("technical" or "matters of form") an inmate may submit a corrected grievance within five days of the rejection:

> If a request is rejected for technical reasons or matters of form, the inmate shall have five days from the date of rejection to file his/her corrected grievance.

*See* https://www.mdoc.ms.gov/Inmate-Info/Documents/CHAPTER_VIII.pdf (last visited April 3, 2019)).

If accepted as a valid grievance, the complaint is forwarded to the appropriate official who then issues a First Step Response to the complaining inmate.[45] *Id*. If the inmate is unsatisfied with the First Step Response, he may continue to the Second Step by completing the appropriate ARP form and sending it to the Legal Claims Adjudicator. *Id*. The Superintendent, Warden, or Community Corrections Director will then issue a final ruling (the Second Step Response) – which completes the ARP process.[46] *Id*. If the inmate is unsatisfied with that response, he may file suit in state or federal court. *Id*.

### The Plaintiff Has Not Exhausted Administrative

---

[45] The submission and screening of the plaintiff's complaints do not constitute the beginning of the ARP process. Instead, the ARP grievance process begins when the inmate's submission is "accepted" as a grievance *after* initial screening. Inmate Handbook, Chapter VIII, Paragraph IV(H).

[46] The grievance process will also be deemed complete if more than 90 days elapses from the beginning of the process (acceptance of the grievance after screening) without issuance of a Second Step Response Form (the normal way to complete the grievance process). Inmate Handbook, Chapter VIII, Paragraph VIII(A). In the absence of a response in a step of the ARP process, the inmate may not simply wait for the 90-day deadline to expire. *Id*. Instead, for each step without a response, he must wait until the deadline for a written response for that step expires, then move to the next step in the process. *Id*. If the inmate has submitted the proper forms for each step, yet 90 days elapses without issuance of a Second Step Response Form, then he has completed the grievance process and may then seek relief in State or Federal court.

**Remedies as to Any of His Claims**

In this case, the plaintiff has not exhausted his administrative remedies as to any of his claims for several reasons. He submitted only one medical grievance during the relevant period: ARP No. MSP-23-979 (alleging inadequate medical care for his injured knee). He did not, however, pursue this grievance to conclusion because he did not appeal the First Step Response. As such, he has not exhausted his administrative remedies as to this claim, as required by the PLRA.

Second, the grievance did not address the remaining issues in this case. The grievance described his leg injury and the alleged failure of various prison staff to send him to medical or treat it; however, the grievance did *not* mention Dr. Scott[47] (by name or position), did *not* mention a failure to obtain an MRI or an ultrasound, and did *not* mention a failure to properly treat his sinus condition. Doc. 37-1 at 17-18. Hence, as the grievance does not pertain to the issues in this case, even if the plaintiff had pursued it to completion, it would not serve to exhaust the plaintiff's administrative remedies. For these reasons, the instant case should be dismissed without prejudice for failure to exhaust administrative remedies.

### The Plaintiff's Claims Also Fail on the Merits

As discussed below, the plaintiff's claims fail on the merits because he has not provided proof that Dr. Scott was deliberately indifferent to his serious medical needs. In order to prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must allege facts which demonstrate "deliberate indifference to the serious medical needs of prisoners [which] constitutes 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment . . . whether the indifference is

---

[47] Dr. Scott is the sole remaining defendant in this case; in order to exhaust his administrative remedies, the plaintiff must submit a grievance involving Dr. Scott and pursue that grievance to conclusion.

manifested by prison doctors or prison guards in intentionally denying or delaying access to medical care . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104-105, 50 L. Ed. 2d 251, 260 (1976); *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). The test for establishing deliberate indifference is one of "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Under this standard, a state actor may not be held liable under 42 U.S.C. § 1983 unless plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838. Only in exceptional circumstances may a court infer knowledge of substantial risk of serious harm by its obviousness. *Id.* Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1986), *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668 (1986).

A prisoner's mere disagreement with medical treatment provided by prison officials does not state a claim against the prison for violation of the Eighth Amendment by deliberate indifference to his serious medical needs. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir.2001), *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). "Deliberate indifference is not established when medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015). Nor is it established by a physician not accommodating a prisoner's requests in a manner he desired or the prisoner's disagreement with the treatment. *Id.*; *Miller v. Wayback House*, 253 F. App'x 399, 401 (5th Cir. 2007). To meet his burden in establishing deliberate indifference on the part of medical staff, the plaintiff "must show that [medical staff] refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any

similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brauner*, 793 F.3d at 498.

### Knee Injury

Burdette has not shown that, objectively, his knee injury was serious – or that Dr. Scott deliberately withheld necessary treatment or diagnostic procedures. Burnette has not shown that Dr. Scott intentionally failed to act, knowing that there was a high likelihood that inaction would result in serious harm. Burdette has not shown that there was any structural damage that an MRI or ultrasound would have revealed – or that there was a high likelihood that the failure to obtain an MRI or ultrasound on Burdette's knee would result in serious harm. Nor has Burdette shown that Dr. Scott had actual knowledge of such likelihood of harm – and that the procedures were necessary to prevent that harm – and that the need for the procedures was obvious. In addition, as Burdette has not come forward with expert testimony to provide the necessary proof, his claim regarding treatment of his knee injury must fail.

### Pain Medication

Similarly, Burdette has not provided evidence of deliberate indifference regarding his claim that the pain medication for his knee injury was ineffective. He has presented no evidence that other pain medications were available in the prison setting that would have been more effective. Indeed, Dr. Scott only saw Burdette on one occasion for his knee injury, and the medical chart does not reflect that Burdette requested that Dr. Scott provide alternative medication for pain. Burdette has not presented any evidence that Dr. Scott was aware of any complaint that the pain medication was ineffective. In addition, the medical records reflect no sick call requests regarding knee pain between his visit with Dr. Scott on June 21, 2023, and the time he left MSP. Further, medical records reflect that Burdette did not complain of pain during a chronic-care examination at HHC shortly after his transfer.

**Medical Care During the Week After Returning to His Housing Unit**

Burdette alleges that after his initial visits to medical on May 24, 2023, he was taken back to the housing unit and left for a week with no medical attention for his knee. However, he acknowledges that he had pain medication during that period, and there is no evidence that he submitted a medical care request during that week informing the medical staff that the medication was not effective. In addition, that week was before the first time Dr. Scott saw Burdette for the knee injury, and he has offered no evidence that Dr. Scott was aware of the alleged lack of medical attention during that week.

To the extent that Burdette is referring to the delay in performing the X-rays on his knee, he has presented no evidence that the delay in obtaining the X-rays caused any harm. Clearly, as the X-rays showed no structural damage, he cannot show that conducting the X-rays sooner would have resulted in his receiving different or additional treatment during that period.

For these reasons, Burdette has not shown that there is a genuine issue regarding his claim that Dr. Scott was deliberately indifferent with respect to the treatment of his alleged knee injury. As such, Dr. Scott is entitled to summary judgment on that claim.

**Sinus Trouble**

The medical records establish that Dr. Scott treated Burdette for his sinus problems. Burdette's allegation that Dr. Scott did not prescribe him another round of antibiotics for his suspected sinus infection is refuted by the medical records, which show that Dr. Scott prescribed a course of Augmentin on June 21, 2023. In addition, Burdette had recently been prescribed the antihistamine Chlorpheniramine, and Dr. Scott kept Burdette's prior prescriptions for the sinus problem in place, ordered lab tests, and requested a CT scan of his head.

Further, as noted above, the medical records show that Burdette was prescribed multiple medications for his sinus symptoms – medications that he *refused to take*. Given Dr. Scott's repeated efforts to treat Burdette's sinus problems, he has not shown that Dr. Scott was deliberately indifferent to his sinus condition; nor has he shown that such indifference prevented him from obtaining potential relief, where he had been prescribed potentially more effective medications – but had refused to take them. In *Willard v. Bentley*, No. 1:21-CV-223-TBM-RPM, 2022 WL 17086710 (S. D. Miss. Oct. 25, 2022), *report and recommendation adopted*, 2022 WL 17084379 (S. D. Miss. Nov. 18, 2022), the plaintiff similarly had refused to take prescribed medication as ordered, and the court held that this refusal precluded him from showing deliberate indifference and a constitutional violation by the defendant. In that case,

> Plaintiff simply refused to take the medication as prescribed. As such, Plaintiff fails to demonstrate deliberate indifference to his medical condition; he merely disagrees with the type of medical treatment received. He believes that Defendants should have provided him with some other type of treatment, though he fails to specify precisely what alternative treatment should have been prescribed. Plaintiff's testimony and medical records demonstrate that there is no genuine issue of material fact as to whether Defendants were deliberately indifferent to his medical condition. To the contrary, Defendants examined, diagnosed, and prescribed medication for his condition.

*Id.* at *2. The facts in the present case mirror those in *Willard*. Burdette was prescribed medications indicated for his condition, and his refusal to take them prevents him from proving that it was the defendant's alleged improper treatment decisions (rather than his own decision to refuse the prescribed treatment) which prevented him from obtaining relief from his symptoms. As with the treatment for the knee injury, Burdette's claim regarding his sinus problems arises solely out of his subjective belief that some other course of treatment would have been better than that prescribed by Dr. Scott and the other medical providers at MSP. As such, this allegation fails to state a valid claim under 42 U.S.C. § 1983.

Burdette also alleges that he never received the CT scan of his sinuses that Dr. Scott requested. However, as set forth above, this allegation is refuted in the record. His medical records show that a CT scan was performed after Burdette brought this action.[48] Burdette has not shown that the delay in the procedure from June to November constituted deliberate indifference and violated his constitutional rights. First, he has presented no evidence that Dr. Scott was responsible for the delay. Second, "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, *which results in substantial harm.*" *Dupuis v. Caskey*, No. 4:08-CV-63, 2009 WL 3156527, at *4 (S. D. Miss. Sept. 28, 2009) (emphasis in original) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir.1993). In *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176 (11th Cir. 1994), *abrogated in part o.g., Hope v. Peltzer*, 536 U.S. 730, 739 (2002), the court said that courts upholding a valid a claim for delay in medical treatment "have concerned medical needs that . . . involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Hill*, 40 F. 3d at 1187.

The court further held that a prisoner who claims that delay in medical treatment violated his constitutional rights "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id*. at 1188.[49] In *Gaudreault v. Municipality of Salem*, 923 F.2d

---

[48] Medical records reflect that Burdette received the CT scan of his head on November 16, 2023, which was after filing the instant case – but *before* he submitted his Response [13] setting forth his claims against Dr. Scott. In his Response, Burdette disingenuously stated that he had already received the CT scan at HHC by alleging that "it never happen[ed] in the last 7 months I spent in Parchman."

[49] The plaintiff may also show the detrimental effect of the delay if it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention" resulting from it. *See Hill*, 40 F.3d at 1187. However, the court finds that, based upon the plaintiff's allegations regarding delay in treatment, a lay person would not easily recognize that the delay would pose a serious danger to the plaintiff requiring a doctor's attention.

203, 208 (1st Cir. 1990), the court held that there was no constitutional violation where "[t]here is nothing in the record to suggest that Gaudreault's injuries were exacerbated in the slightest by the delay in providing treatment." The record in this case contains no such evidence.

As noted, the CT scan revealed no "acute intercranial findings" and no pathology of the sinuses. This report undermines Burdette's attempt to prove that the CT scan revealed some problem with his sinuses requiring a particular treatment – one he was not receiving. Such proof would require expert testimony. Hence, Burdette has neither alleged nor proven that the CT scan showed any treatable condition causing his sinus symptoms or that a delay resulted in ameliorative treatment that could have been provided earlier. Thus, Burdette has offered no evidence to show that performing the CT scan any sooner would have resulted in a better outcome as to Burdette's sinus condition. As such, Burdette has not shown that the delay constituted deliberate indifference, and his claim based on the delay in performing the CT scan must fail.

For the foregoing reasons, Burdette has not shown that there is a genuine issue regarding his allegation that Dr. Scott was deliberately indifferent to his serious medical needs regarding treatment of his sinus condition. Therefore, Dr. Scott is entitled to summary judgment on that claim.

### Conclusion

For the reasons set forth above, the motion [37] by the defendant for summary judgment will be granted, and the instant case will be dismissed with prejudice for failure to state a claim upon which relief could be granted. In the alternative, the instant case will be dismissed for failure to exhaust administrative remedies. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 27th day of January, 2025.

/s/   David A. Sanders
UNITED STATES MAGISTRATE JUDGE